(120 App. Div. 338)

## PEOPLE v. MADDEN.

(Supreme Court, Appellate Division, First Department. June 28, 1907.)

1. LARCENY—GRAND LARCENY—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held* to support a conviction of grand larceny in the second degree.

2. CONSTITUTIONAL LAW—EXECUTIVE POWERS—ENCROACHMENT ON JUDICIARY.

Pen. Code, § 700, provides that a male convicted of felony who has not theretofore been convicted of a crime punishable by imprisonment in a state prison may be sentenced to imprisonment in the state reformatory at Elmira. Laws 1887, p. 917, c. 711, § 9, provides that the court imposing such a sentence shall not fix the duration thereof, but that the term of imprisonment shall be determined by the managers of the reformatory. Laws 1900, p. 892, c. 378, § 20, provides that the managers may allow any prisoner to go on parole. Section 21 provides that, if a paroled prisoner has violated the conditions of his parole, he may be retaken. Section 22 authorizes the board of managers to make rules prescribing the conditions of the parole. Section 24 provides that, on a reasonable probability that any prisoner will remain at liberty without violating the law, the managers shall issue an absolute discharge from imprisonment. *Held*, that the authorization of the sentence of a prisoner to the state reformatory, without a fixed term, was not unconstitutional, as being an encroachment on the judicial department of the state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 61.]

3. SAME—INVASION OF PARDONING POWER.

Pen. Code, § 700, provides that a male convicted of felony, who has not theretofore been convicted of a crime punishable by imprisonment in a state prison, may be sentenced to imprisonment in the state reformatory at Elmira. Laws 1887, p. 917, c. 711, § 9, provides that, on conviction of any person of an offense punishable by imprisonment in the state reformatory at Elmira, the court shall not fix the duration of the sentence, but that the term of imprisonment shall be determined by the managers of the reformatory. Laws 1904, p. 892, c. 378, §§ 20, 21, provide that the board of managers may allow any prisoner confined in the reformatory to go on parole, and for his retaking on violation thereof. Section 22 authorizes the board of managers to prescribe the conditions of the parole. Section 24 provides for an absolute discharge from imprisonment. *Held*, that the authorization of the sentence of a prisoner to the state reformatory, without a fixed term, and his parole and final discharge by the board of managers, were not in conflict with Const. art. 4, § 5, vesting the pardoning power in the Governor; for by the express provisions of Laws 1900, p. 894, c. 378, § 24, the pardoning power is reserved to the Governor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 87.]

Appeal from Trial Term.

Daniel J. Madden was convicted of grand larceny in the second degree, and he appeals. Affirmed.

Argued before McLAUGHLIN, INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Henry Hardwicke, for appellant.

Robert C. Taylor and E. Crosby Kindleberger, for the People.

LAUGHLIN, J.   The appellant was jointly indicted and tried with one Delaney on a charge of grand larceny, in having taken from the person of one John Wenninger a finger ring, gold watch, bank check for $24, and $16 in money.   The appellant and Delaney were friends; but they were strangers to the complainant, who resided in Westchester and came to the city about 1 o'clock Sunday morning, November 11, 1906, with a view to taking a turkish bath and remaining at the bath overnight.   He first had supper and something to drink, and then took a bath, but concluded not to remain.   He went from the bath to the American Hotel, at the corner of 125th street and Third avenue, and on leaving the hotel at about half-past 6 o'clock, Delaney, who was on the sidewalk, spoke to him, saying in substance that the people in the hotel had attempted to eject him, and that Delaney's friend, the appellant, was in the hotel then, remonstrating with the bartender for having threatened to eject the complainant.   It is evident that complainant, either from want of sleep or the effect of drink, was not fully conscious as to all that took place when he had been in the hotel; for he believed this representation, although it surprised him.   They were then joined by the appellant, who invited them to McClatchy's saloon, at 125th street and Lexington avenue, to have a drink.   The complainant, according to his evidence, accompanied them as a matter of courtesy, on account of their having befriended him.   Shortly after they entered the saloon, a question arose concerning the time, and he drew his gold watch from his vest pocket and found that it had stopped.   After winding it, and setting it by a clock in the barroom, he replaced it in his pocket.   He had a solitaire diamond ring on one of his fingers, and a government check for $24 and about $18 in money in his right-hand trousers' pocket.   They remained in the saloon about three hours and had several rounds of drinks.   The complainant, according to his testimony, took one drink of whisky, one of beer, and one of seltzer, and he did not wish to drink, but was urged to do so by the appellant and Delaney.   While they were in the saloon, the appellant complained of having a toothache, and went out twice for the express purpose of getting toothache drops, and finally said that he had succeeded.   The appellant and Delaney spoke of a friend whom they desired the complainant to meet, and at their suggestion he accompanied them to a saloon on 122d street and Lexington avenue to meet their friend.   They met no one there whom they knew, and made no further allusion to the friend.   They had a round of drinks there, the complainant taking whisky.   They were seated around a small table in a large room.   Some men were seated at two other tables a considerable distance away.   The complainant testified that, after he took the drink there, "it seemed like a sort of overpowering feeling came over me," and he dozed off, and that when he awoke the defendant and Delaney had gone, and he at once missed his watch and discovered that his ring and money had also disappeared.   One of the men seated at one of the other tables testified that he saw appellant and Delaney leave the complainant at the table and depart from the

saloon, that when he left the complainant was still there, and that up to the time he left no one went near him after they departed. He also testified that, when he left, only two others remained in the room, and they were seated together at a table, and he knew one of them to be an iron worker. The bartender testified that the appellant and Delaney left complainant when he was apparently asleep. On the 20th or 21st day of November, the complainant, acting under the advice of the police, discovered and identified the appellant in Hasting's saloon, at the corner of 125th street and Second avenue. Shortly thereafter, the police arrested the appellant and one Ryan, who was with him. The two police officers who took the appellant and Ryan to court in the morning testified that on the way Ryan opened the conversation on the subject of returning the property, and the appellant said to one of the officers, "If I give the stuff back, do you think the rapper will pull off?" to which the officer replied, "I guess he will," whereupon Ryan, addressing the appellant, said, "You are a sucker if you don't give it back," and appellant made no reply. The officer testified that "rapper" means the complainant.

The defendant testified in his own behalf, and denied the commission of the crime and this conversation with the officers; but he admitted that he was familiar with the meaning of the word "rapper," as testified to by the officer. One of the officers also testified that, after the formal complaint against the appellant was prepared at the courthouse, appellant sent "his woman" with a note "somewhere on the west side to somebody to get the stuff back." It appears, however, that the officer did not read the note. This officer also testified that the appellant, at about the same time, told him that "the stuff" was in Brooklyn. The complainant evidently suspected that he was drugged, and he was permitted to say, without objection or motion to strike it out, that he did not know whether or not something was put into his drink. However that may be, the circumstances as testified to by the complainant indicate that the purpose and design on the part of the appellant and Delaney in taking an interest in him was not through friendship or for his good. He testified that he had all of his property when he entered the last saloon with the appellant and Delaney, and when he dozed off. It is evident, therefore, if his testimony is to be believed, that he was robbed by some one. There is not evidence that any one other than the appellant and Delaney was near him. The bartender was a witness, and there was nothing to point suspicion toward him. One of the other guests was a witness. He has steady employment and apparently was a reputable citizen. The only others whose conduct is unaccounted for were the two men seated at a table some distance from the complainant, and it appears that one of those was an iron worker. It is improbable that either he or the man with whom he was visiting would commit such a serious crime. If the appellant made the admissions to the police officers, those alone would clearly show his guilt. The nature of the evidence, and the fact that he was familiar with the use of the word "rapper" as used in criminal circles, render their testimony highly probable. The verdict of the jury, therefore, is fairly warranted by the evidence, and no exception, other than

to the sufficiency of the evidence taken upon the trial, is urged as a ground for reversal.

The appellant was 27 years of age, and he was sentenced to be imprisoned in the New York state reformatory at Elmira, "There to be dealt with according to law." It is contended by the learned counsel for the appellant that the sentence is illegal and void, upon the ground that no term of imprisonment was prescribed by the court, and that the statute purporting to authorize the sentence of a prisoner to the Elmira reformatory, without fixing a term .of imprisonment, is unconstitutional and void. The special advantage that would be derived by his client from having this contention, which would result in his being sentenced to state's prison, sustained, is not apparent. However, since the question is frequently raised, it may as well be decided. Section 9, c. 711, p. 917, of the Laws of 1887, which we assume is still in force, for it was expressly excepted from the repealing clause contained in chapter 378, p. 884, of the Laws of 1900, which repealed all but two sections of the act, provides that any person who shall be convicted of an offense punishable in the New York state reformatory at Elmira, and shall be sentenced to be imprisoned therein—

"shall be imprisoned according to this act and not otherwise, and the courts of this state imposing such sentence shall not fix or limit the duration thereof. The term of such imprisonment of any person so convicted and sentenced shall be terminated by the managers of the reformatory, as authorized by this act; but such imprisonment shall not exceed the maximum term provided by law for the crime for which the prisoner was convicted and sentenced."

Section 700 of the Penal Code provides that:

"A male between the ages of sixteen and thirty, convicted of felony, who has not theretofore been convicted of a crime punishable by imprisonment in a state prison, may, in the discretion of the trial court, be sentenced to imprisonment in the New York state reformatory at Elmira,. to be there confined under the provisions of law relating to that reformatory."

It may be that this provision is sufficient to prescribe the form of sentence, without having recourse to said section 9 of chapter 711 of the Laws of .1887. It is not very material whether both provisions are to be construed as applicable, or only one; for, under either or both, the law contemplates that the court shall not prescribe a fixed term of imprisonment. Said chapter 378, p. 884, of the Laws of 1900, is a revision of the laws relating to the state reformatory at Elmira, and supersedes chapter 711 of the Laws of 1887, excepting sections 7 and 9 thereof, which, as has been seen, were not repealed. Section 20 of said chapter 378 of the Laws of 1900 authorizes the board of managers of the reformatory to allow a prisoner "to go upon parole outside of the reformatory buildings and enclosures, pursuant to the rules of the board of managers." Section 21 provides for retaking a prisoner who has violated his parole, and that upon the return of the prisoner he may be retained "for the remainder of the maximum term provided by law." Section 22 authorizes and directs the board of managers to make rules not inconsistent with law, prescribing, among other things, the conditions under which prisoners "may be paroled or conditionally released," and regulating the retaking and reimprisonment of prisoners, and providing for the employment, discipline, instruction,

and education of the prisoners.    Section 24 provides that when it
appears to the board of managers—

"that there is strong or reasonable probability that any prisoner will remain
at liberty without violating the law, and that his release is not incompatible
with the welfare of society, they shall issue to such prisoner an absolute re-
lease or discharge from imprisonment.    Nothing herein contained shall be con-
strued to impair the power of the Governor to grant a pardon or commutation
in any case."

The effect of these provisions is that a person sentenced to the El-
mira state reformatory may be detained there until the expiration of
the maximum period prescribed by law as a punishment for the offense
where the defendant is sentenced to a state prison.    There is no differ-
ence in principle between the statute and section 687a of the Penal
Code, which provides for what is known as an "indeterminate sen-
tence," requiring the court to prescribe the maximum and minimum.
The precise objection is that the court does not fix the term of im-
prisonment and that pardoning power is conferred upon prison offi-
cials.    The provisions of section 687a have been sustained as constitu-
tional by the Court of Appeals.    People v. Adams, 176 N. Y. 351, 68
N. E. 636, 63 L. R. A. 406, 98 Am. St. Rep. 675.    If it be competent
for the Legislature to leave it to the prison board of commission to de-
termine, according to their view of the conduct of the prisoner, whether
he shall serve one year or five years under an indeterminate sentence,
with that minimum and maximum limitation, I fail to see why it is
not equally competent for the Legislature to leave it to a prison board
or the board of managers of the Elmira state reformatory to say, ac-
cording to their view of the conduct of the prisoner, whether he shall
remain there one day or five years ; a maximum period being pre-
scribed by the law, and no minimum period being prescribed which is
equivalent to a minimum period of a moment.    It was entirely com-
petent for the Legislature to direct the courts to sentence prisoners
convicted of felonies to the Elmira state reformatory for the definite
maximum period prescribed for such an offense, if punishable in the
state prison.    People ex rel. Abrams v. Fox, 77 App. Div. 245, 79 N.
Y. Supp. 56.    Since it was competent for the Legislature to prescribe
the maximum period of imprisonment, and require the imprisonment
for a definite period of years corresponding therewith, it is difficult to
see upon what theory a defendant is prejudiced by the Legislature hav-
ing made this humane provision in the interest of first offenders, to
encourage them to reform, without suffering a period of imprisonment
of such duration that they might abandon hope of opportunity to re-
gain a standing in the community.

In Michigan, statutes prescribing an indeterminate or a maximum
sentence have been declared unconstitutional as an encroachment upon
judicial functions and as in conflict with that part of the Constitution
vesting the pardoning power in the Governor (People v. Cummings,
88 Mich. 249, 50 N. W. 310, 14 L. R. A. 285, and cases cited) ; but the
concensus of judicial authority is in accord with the decision of our
Court of Appeals in People v. Adams, supra, holding that such stat-
utes are constitutional.:    State ex rel. Attorney General v. Peters, 43
Ohio, 629, 4 N. E. 81 ; George v. People, 167 Ill. 447, 47 N. E. 741 ;

Miller v. State, 149 Ind. 607, 49 N. E. 894, 40 L. R. A. 109; Murphy v. Commonwealth, 172 Mass. 264, 52 N. E. 505, 43 L. R. A. 154, 70 Am. St. Rep. 266. This court has sustained the constitutionality of a statute prescribing a sentence for a fixed term, with authority vested in the prison officials to discharge at an earlier day, according to the facts to be ascertained by them with respect to the record of the prisoner as to former convictions. People ex rel. Abrams v. Fox, 77 App. Div. 245, 79 N. Y. Supp. 56. The constitutionality of the statute authorizing the sentence of a prisoner to the Elmira state reformatory, without a fixed term, has been sustained by three different justices at Special Term. Matter of Weber, Daily Register, Aug. 17, 1888; Matter of Gilmore, N. Y. Law Journal, Aug. 26, 1893; People ex rel. Bettram v. Warden, 105 N. Y. Supp. 551. See, also, Duntz v. Coon, 67 Hun, 523, 22 N. Y. Supp. 865.

We are of opinion, therefore, that the Legislature, in enacting this statute, did not unwarrantably encroach upon the judicial functions, nor did it contravene the provisions of section 5, art. 4, of the state Constitution, which vests the pardoning power in the Governor; for, by the express terms of the statute, the pardoning power is expressly reserved to the executive.

It follows that the judgment of conviction should be affirmed. All concur.