The People of the State of New York ex rel. Owen Madden, Relator, *v.* Robert H. Barr, as Warden, and Others, Respondents.*

The People of the State of New York ex rel. Jeremiah J. Sullivan, Relator, *v.* Robert H. Barr, as Warden, and Others, Respondents.

The People of the State of New York ex rel. Terence Reilly, Relator, *v.* Robert H. Barr, as Warden, and Others, Respondents.

The People of the State of New York ex rel. Gustave Guillaume, Relator, *v.* Robert H. Barr, as Warden, and Others, Respondents.

Supreme Court, New York County, April 4, 1932.

*Joseph Shalleck, William T. Harris* and *Fred D. Kaplan* [*Samuel H. Kaufman* and *Emil Weitzner* of counsel], for the relators.

*John J. Bennett, Jr., Attorney-General* [*Peter J. Brancato* and *John T. Cahill* of counsel], for the respondents.

LEVY, J. Relators were apprehended pursuant to warrants issued by a member of the Board of Parole of the State of New York for violation of parole and incarcerated in the city prison pending their return to State prison for determination by the Board of their alleged delinquency. They now seek release by habeas corpus on the ground that the Parole Board has no jurisdiction over them. In answer we find returns, supplemental returns and even additional supplemental returns, met by traverse and also supplemental traverse. While the facts in the four cases differ in detail, and the same principles of law are not applicable to all, the common question of the jurisdiction of the Parole Board involved in all renders it feasible to dispose of them in the one memorandum. Moreover, because of the nature of the proceedings, the exigencies are such as to invite speedy decision, if not immediate disposition.

A summary of the criminal record of the four relators is as follows:

*Sullivan:* Convicted March 25, 1918, of murder, second degree; sentenced to a term of not less than twenty years to life imprisonment; sentence commuted by the Governor, May, 1928; conditionally released by the Board of Parole June 15, 1928; pardoned and restored to citizenship by the Governor on December 30, 1930.

*Reilly, also known as Robinson:* Convicted of burglary, first degree, in 1915; sentenced to a term of not less than ten years and six months to twenty years and six months; sentence commuted by the Governor and conditionally released in 1921; convicted again on January 24, 1921, of impersonating an officer, and sentenced to a term of seven years in prison and, in addition thereto, to serve the unexpired maximum term of the sentence on the original commitment; sentence commuted by the Governor on June 27, 1930, and conditionally released.

*Guillaume:* Convicted March 31, 1919, of murder, second degree; sentenced to a term of not less than twenty years to life imprisonment; sentence commuted by the Governor and conditionally released on April 25, 1929.

*Madden:* Convicted June 15, 1915, of manslaughter, first degree, and sentenced to a term of not less than ten years to not more than twenty years; released on parole on February 24, 1923; reported monthly to the Catholic Protective Society under the conditions of his parole until January, 1927, then under " suspended reports " privilege, quarterly, by mail until February, 1929; claims to have been discharged from parole in March, 1929.

The returns to the writs do not indicate any substantial charges against any of the relators. They are not accused of the commission of any crimes, although, as to Madden only, intimations are made of his having lapsed into evil associations, in violation of the terms of his parole. In this connection it might be appropriate to observe that nothing material is proffered in support of the mere conclusions save, possibly, certain testimony which is challenged as incompetent — the matter of the Levy employment incident and the claim that there is " common belief " and " common gossip " that Madden is a " beer racketeer of no little importance " and has projected his " racketeering methods even in legitimate business." Quite apart from the fact that the court is not at liberty to consider blanket indictments of this character, it nevertheless is a very sad commentary upon the administration of the criminal law by both Federal and State authorities that he has not been pursued according to law.

The relators contend that the Parole Board has no jurisdiction over them, or if it had such authority, the latter has lapsed; and that, in any event, even if its jurisdiction to apprehend still exists, it must yield to the courts the question of the determination of delinquency. Respondents' attempt at the outset to brush aside this contention by reference to *People ex rel. Ackron* v. *Hunt* (122 Misc. 247) is vain. That case merely stands for the proposition that the action of the Parole Board in revoking a parolee's release

cannot be *reviewed* by habeas corpus. But where the *jurisdiction* of the Board to take affirmative action is challenged, habeas corpus seems to be the only adequate remedy.

It is to be noted that the rights of the relators cannot be measured by the provisions of the Correction Law, adopted in 1929 (Laws of 1929, chap. 243), which re-enacted the whole of article 8 of the Prison Law. Section 223 of the Correction Law, which is substantially identical with the same numbered section of the Prison Law (added by Laws of 1928, chap. 485), reads as follows: " The provisions of this article shall apply to every person sentenced to an indeterminate sentence on or after July first, nineteen hundred and twenty-eight, and confined in a state prison and who has never before been convicted of a crime punishable by imprisonment in a state prison. It shall not apply to any other persons. All rules of the board of parole applying to the parole of prisoners sentenced to prison before July first, nineteen hundred and twenty-eight, shall continue to have the force and effect of law."

The relators were all convicted and sentenced prior to July 1, 1928. Obviously, the statute applying to them is the Prison Law as it existed before that date; and it may be well to note that unless otherwise indicated, the sections cited hereinafter have reference to that statute prior to the revision of 1928.

Under it a system of parole or conditional release from imprisonment in State prison, together with a method of discharge prior to the expiration of the maximum sentence, was established. The administration of the system was intrusted to a Board of Parole. Sections 211 and 211-a of the Prison Law limited the power of the Board to the consideration of prisoners who had received indeterminate sentences, or who, having received definite terms of imprisonment, were first offenders. The parole system was a rather important step in the scheme of social readjustment. It was regarded as a progressive and beneficent means by which prisoners were given encouragement to strive for liberty from imprisonment for a portion of their term, and if successful, were allowed to retain their liberty under conditions of good behavior. The privilege was evidently deemed too great to be extended to second offenders, and hence they were not included within the scope of its benefits. Commutation by the Governor was the only method by which the term of such prisoners could be conditionally shortened. But even as to these, the Governor, pursuant to section 243 of the Prison Law (as amd. by Laws of 1921, chap. 567), annexed the con-

dition of subsequent good behavior within the limits of the expiration of the original maximum term; and he left the supervision over the faithful observance of these conditions to the Board of Parole.

It becomes clear that the challenge by Reilly, a second offender, of the fundamental jurisdiction of the Board over his person is not well founded. When the Governor commuted his sentence, he indeed delegated to the Board of Parole the execution of his directions and the supervision over the prisoner. Whether he also delegated to the Board the duty of determining the fact of delinquency or breach of condition by the recipient of executive clemency is another question that will be considered later.

Section 218 of the Prison Law lends support to the view that the jurisdiction of the Board of Parole is not limited to persons originally sentenced to an indeterminate term, or even to prisoners originally sentenced for a definite term, provided they were first offenders. Thus, that section, as first adopted, contained these mentioned limitations, indicating that the right of absolute discharge was limited to prisoners originally sentenced to an indeterminate term. As to those sentenced to a definite term, the power of the Board was confined to the duty of reporting the case to the Governor with recommendations. The purpose which led to the amendments would thus seem to indicate that when the Governor commutes a sentence with conditions annexed, and charges the Parole Board with guarding the observance of these conditions, that Board obtains jurisdiction of the recipient of executive favor in the same manner as if it acquired jurisdiction under sections 211 and 211-a of the Prison Law, subject, however, to the limitation expressed in the *Atkins* case hereinafter noted. In other words, although Reilly was sentenced for a definite term as a second offender, his commutation by the Governor and his conditional release by the Parole Board pursuant thereto, rendered him subject to its jurisdiction and rules until the expiration of his original term. This view is also supported by *People ex rel. Sabatino* v. *Lawes* (127 Misc. 575; affd., 217 App. Div. 779). There the relator was sentenced as a second offender to sixteen years in State prison. His sentence was commuted by the Governor, subject to the annexed condition contained in section 243 of the Prison Law. He was released and subsequently reimprisoned by virtue of a warrant from the Parole Board. In attacking the jurisdiction he urged that he could not be rearrested unless he committed a felony, and that the Board had no authority over him because he was a second offender. The court held that section 243 did not make it a condition precedent to arrest that a felony be committed, but gives to the Parole Board jurisdiction over the relator. Any reasoning

which applies to support the authority of the Board after commutation of sentence in the case of Reilly, a second offender, applies with even greater force to Guillaume, whose minimum sentence was reduced by commutation on the part of the Governor.

The jurisdiction of the Parole Board is acquired, in the case of commutations, by virtue of section 243 of the Prison Law, as amended by chapter 567 of the Laws of 1921, which reads as follows: " The governor shall, in reducing the sentences of convicts not subject to the jurisdiction of the board of parole, annex a condition that such convict shall live and remain at liberty without violating the law, and be subject to the jurisdiction and control of the board of parole for state prisons as provided in article eight hereof, excepting section two hundred and eighteen thereof, and also a condition to the effect that if any such convict shall, during the period between the date of his discharge by reason thereof and the date of the expiration of the full term for which he was sentenced, be convicted of any felony, committed in the interval as aforesaid, he shall, in addition to the sentence which may be imposed for such felony and before beginning the service of such sentence be compelled to serve in the prison or penitentiary in which he may be confined for the felony for which he is so convicted, the remainder of the term without commutation which he would have been compelled to serve but for the commutation of his sentence as provided for in this article; but he may, however, earn compensation in reduction of the remainder of such term."

Pursuant to the authority granted by that section, the sentences of Reilly and Guillaume were commuted by the Governor, with the condition annexed, providing for the restoration of the original term in the event of the commission of a felony. The other conditions specified in section 243 were not attached, but they must be implied both from the substance of the section, passed subject to the authority of article IV, section 5, of the Constitution, and the language of *People ex rel. Cecere* v. *Jennings* (250 N. Y. 239, 240). As was said in the latter: " The Governor's order was not effective in and of itself to require that the appellant be released from custody. The sentence was still an indeterminate one, subject to the action of the Board of Parole for State Prisons, the only change being a reduction of the minimum (*People ex rel. Atkins* v. *Jennings*, 248 N. Y. 46, 49, 50)." The release from the prison walls became effective as to the relators whose terms were commuted, when they were allowed their liberty on parole by order of the Parole Board, acting as the agent of the Governor. But they " remained even then, until the expiration of the maximum term, in the legal cus-

tody and under the control of the warden of the prison (Prison Law, section 214; L. 1909, ch. 47; Consol. Laws, ch. 43; cf. *People ex rel. Newton* v. *Twombly*, 228 N. Y. 33)." (*People ex rel. Cecere* v. *Jennings, supra.*) Having the jurisdiction delegated to it either by virtue of section 243, or by direct act of the Governor, the Parole Board had the right to adopt reasonable rules governing the conduct of the prisoners while under parole outside the walls, a violation of which would justify their reincarceration if it occurred prior to the expiration of the maximum term of the sentence. These rules, not unreasonable in themselves, are annexed to the several releases, and it is presumably for alleged violations of these that the relators were arrested. It is not charged, however, that they committed any felony, much less that they were convicted of one.

The cases of Guillaume and Reilly may be considered together, because of the similarity of the principles involved. The question of the jurisdiction of the Parole Board to rearrest them is the primary one.

It is urged by the relators that while the Board of Parole may be used as an agency of the Governor in annexing conditions to the commutations, and vested with authority to aid in seeing that the conditions are enforced (*People ex rel. Mongno* v. *Lawes*, 225 App. Div. 193), the Governor cannot legally delegate the power to the Board to decide whether or not the conditions of the parole have been violated, and to order reimprisonment. The very case cited might seem to sustain such a right. The court there said (at p. 198): "Under his constitutional authority the Governor is empowered to utilize the Parole Board as an agency to aid him in enforcing the terms imposed upon the prisoner as a condition of his liberation. He might, if so minded in the functioning of his power, have invoked the aid of another and different agency. His constitutional power is, in either case, duly exercised." But while this case sustains the jurisdiction of the Board to rearrest them and hold them for a determination of the issue of their delinquency as violative of the conditions of the commutations, it is extremely doubtful whether the Board itself may pass upon that issue.

This leads to the consideration of the serious contention advanced by the relators, that as they enjoy their freedom from actual imprisonment in consequence of a commutation from the Governor, they have an inalienable right to have the issues of their alleged violations of its conditions tried by a jury, pursuant to sections 696 and 697 of the Code of Criminal Procedure. They support

this claim by reference to *People ex rel. Atkins* v. *Jennings* (248 N. Y. 46). There the court, after discussing the usual method of retaking a paroled prisoner for violating the condition of his freedom, declared: " *This procedure under* the provisions of *the Prison Law,* with its implication of wide discretion in the Parole Board in declaring delinquency, *does not apply to the case of one who has become an escaped convict in the eyes of the law by violating the condition of his commutation.* His rights are more explicitly defined. (Code Crim. Pro., sections 696, 697.) *He may not be retaken merely as a delinquent paroled prisoner by order of the Parole Board."* (Italics mine.)

It seems somewhat incongruous that the law as it existed at the time of that decision should have been more tender of the rights of offenders whose status was too serious for mitigation by the Parole Board, and with relation to whom only the Chief Executive could exercise clemency, than of those who belonged to the first offender class. Historically, this may be explained by the fact that at the time of the adoption of the sections of the Code of Criminal Procedure referred to, the system of parole as applied to State prisons was only in its infancy, and the usual method of reduction of the term of actual imprisonment was accomplished by commutation or conditional freedom. A uniform method of dealing with violations of the conditions of release had not been devised prior to the adoption of those sections. The submission of the question to the Executive who had exercised the act of grace might have been the logical solution, but it would have imposed an undue burden upon him. The seizure of the violator by the warden of the prison from which he was released seemed too arbitrary, and was criticized in *People* v. *Burns* (77 Hun, 92; affd., on opinion below, 143 N. Y. 665). It was there suggested that a *judicial inquiry* as to whether the conditions had been broken was *appropriate,* and the issue might be submitted to a *jury.* This method adopted in the case in 1894 received legislative sanction the same year by the enactment of sections 696 and 697 of the Code of Criminal Procedure. With the development of the parole system applicable to first offenders, an adequate method for dealing with violators of parole was developed under the jurisdiction of the Board of Parole. No opportunity for trial by jury was provided, and the determination of the Parole Board was not subject to review. Harsh as that method seemed compared with the other, it received the sanction of the courts. In *People ex rel. Roman* v. *Parole Commission of the City of New York* (116 Misc. 758; affd., 205 App. Div. 840) Mr. Justice McAvoy thus explained the system: " The Parole Commission Law (Laws of 1915, chap. 579) neither expressly

nor impliedly gives this right of review of the commission's decisions or determinations. The law permits that body to retake conditionally released prisoners during the maximum term of sentence (§ 5) and to make rules regulating recapture of such prisoners. Presumably, a rule allowing the recapture of a prisoner conditionally released may be made which permits the commission to issue its warrant when one of its officers reports a violation of a parole condition, and the determination thus made is not reviewable under the scheme of the law, else every recapture would lead to a trial of the issue. Did the prisoner violate the parole? The conditional parole is not a right, but a privilege in the discretion of the commission, and its revocation and the proof on which that act is done is also within the regulatory power of that body. The paroled prisoner is until discharged finally constructively in imaginative jail limits, which may be narrowed or widened as appears proper to the commission during the maximum term of the sentence fixed by law at not more than three years. This power of recapture and recommitment appears to be almost arbitrary under the law, but, at any rate, it is not an unconstitutional grant of power by the legislature as appears from an examination of appellate rulings in the Elmira Reformatory cases, where similar exercises of power by the board of managers of that institution have been sustained. (Consult, for example, *People* v. *Madden*, 120 App. Div. 338.) "

While the observations of Mr. Justice McAvoy deal with parole of prisoners convicted of less serious charges, they may be assimilated in principle to the procedure concerning retaking of paroled persons released from State prisons.

The procedure laid out in section 217 of the Prison Law did not provide for any judicial determination of the issue of the delinquency of the retaken prisoner. The law of 1928 (Prison Law, § 218, as added by Laws of 1928, chap. 485), now incorporated in the Correction Law, while withdrawing many benefits which paroled prisoners were entitled to receive from the Board, such as conditional and absolute discharge, nevertheless, in section 218, made provision for *judicial* determination of the issue of violations of parole, by providing for the holding of a parole *court* at the prison to pass upon the charges. As, however, that provision by virtue of section 223 of the 1928 revision of the Prison Law is only applicable to persons sentenced on or after July 1, 1928, it has no application to the relators.

The law applicable to violators of parole granted in consequence of commutation by the Governor, at least as regards persons sentenced prior to July 1, 1928, is defined in *People ex rel. Atkins* v. *Jennings* (*supra*). Notwithstanding the fact that the Parole

Board as agent of the Governor is charged with the duty of supervising the conduct of the paroled prisoner, it does not have the right to make judicial determination of the fact of his delinquency. Judge POUND explains that the rights of such a person are more explictly defined by the Code of Criminal Procedure, sections 696 and 697. While the incongruity of treating more hardened prisoners, to whom the Governor may extend clemency, more tenderly than less hardened offenders, has already been commented upon, nevertheless, it is not for the courts to disregard statutory mandates. Possibly the need for a *judicial* determination of delinquency in all cases, whether arising from original jurisdiction of the Parole Board or from power delegated to it by the Governor under section 243, led to the adoption of the principle of section 218 of the present Correction Law providing for the consideration of each case by a parole *court*. And possibly, too, that section is intended to abolish the distinction between those who have been released by the Parole Board as a consequence of commutation, and those who have been so released by virtue of the original jurisdiction of that Board. But as far as the relators Reilly and Guillaume, whose terms were commuted by the Governor, are concerned, the provisions of the Correction Law do not apply, but those of the Prison Law prior to the revision of 1928.

The facts upon which these two relators were apprehended, while meagre, may be sufficient to sustain a warrant for their apprehension. But as they cannot be tried for violation of their parole by the Parole Board itself, even sitting as a parole *court*, the question of their delinquency must be determined by some judicial proceeding. As already pointed out, they claim the right to a jury trial pursuant to sections 696 and 697 of the Code of Criminal Procedure. Section 697, however, was repealed by chapter 38 of the Laws of 1930. The relators, nevertheless, contend that their right to a trial by jury is inviolable under the Constitution by reason of article I, section 2, which reads: " The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever; but a jury trial may be waived by the parties in all civil cases in the manner to be prescribed by law." Very elaborate reasoning is presented to show that the repeal of section 697, which resulted in depriving an alleged violator of a conditional commutation or pardon of a jury trial, was unconstitutional. But a person released in consequence of such commutation is still constructively a prisoner, and he certainly has not been restored to full civil rights. It is, therefore, by no means clear that he has an inalienable right to have the charge of his breach of discipline in the precincts of his jail liberties tried by a jury. But, at all events, such a prisoner, having been sen-

tenced prior to July 1, 1928, seems to me entitled to a judicial determination of the fact of his delinquency, not necessarily by jury, but by some judicial tribunal. True, it might be argued that since section 218 of the present Correction Law provides for a parole *court*, it thus furnishes the needful protection against arbitrariness on the part of the prison authorities. But the date of the sentence of the relators expressly bars the application of that section to their cases. And since by force of the language in the *Atkins* case the alleged delinquency of parolees who have been granted grace by the Governor must be determined by judicial process, their fate cannot be left to the Parole Board but must be settled by the court, when that process is invoked, as it is here. Accordingly, the court intimated that it would hear evidence in these situations, wherever appropriate. At the urgent request of the Attorney-General, acquiesced in by the relators, affidavits have been received in lieu of oral testimony. These bear principally upon the case of Madden, and nothing is submitted as to the other relators, more particularly Reilly and Guillaume. Weighed by the rules of evidence which must govern a judicial inquiry, the record is absolutely barren of competent proof that Reilly and Guillaume have violated the condition of their commutation. They must, therefore, be acquitted of the accusation, their writs respectively sustained, and Reilly and Guillaume ordered discharged.

As to relator Sullivan, an even more favorable situation is presented. On December 30, 1930, the Governor issued to him a *pardon* " from the offense whereof in our said court he stands convicted as aforesaid, and of and from all sentences, judgments and executions, and he is hereby restored to *all* the rights of a citizen." The pardon further contained a proviso that it was granted upon the express understanding that it should not cancel or void any condition or conditions upon which he was released from imprisonment. Operating without this provision, the pardon undoubtedly would have restored Sullivan to all his civil rights and made him a " new " man in every respect. The respondent, however, contends that the condition of the pardon kept alive the jurisdiction of the Parole Board. It seems inconceivable that a pardon of this character should be less effective than an absolute discharge by the Board of Parole under section 218 of the Prison Law.

In *People ex rel. Brackett* v. *Kaiser* (209 App. Div. 722) the court held that the action of the Board in granting an absolute discharge terminates the sentence as effectually as if it had been a definite sentence which by its terms expired at that time. It would follow that such a discharge absolutely terminates the jurisdiction of the Board of Parole. The effect of the condition annexed to the

pardon can be no broader than, as declared in the *Brackett* case, to require the defendant to refrain from the commission of a felony during the period of the maximum limit of his sentence. If he should be convicted of a felony during that period, it would not lie within the power of the Parole Board to apprehend him. The warden of the prison where he would be confined for such later offense could hold him beyond the expiration of the sentence for that offense during the length of his unexpired term. In any event, until convicted of another felony, he is in the eyes of the world a man whose previous sentence has been expiated and over whom the Board of Parole cannot have the slightest vestige of jurisdiction. Any other holding would render the Governor's pardon and restoration to citizenship a mere scrap of paper. It would, in effect, treat a person who in the eyes of the law has completely atoned for his crime, as continuing within jail limits, broad though these may be. It would hold over the head of the pardoned person " the terrors of having his period of liberty wholly obliterated as though he had never been out of prison " (*People ex rel. Mongno v. Lawes*, 225 App. Div. 193), and under fear of being seized by the Board for the infraction of a rule or for any breach of decorum for which the ordinary free person might have nothing to answer to the law. Such a situation would make a hollow mockery out of the formidable document issued by the Governor under the great seal of the State. In the circumstances, Sullivan's status must be deemed the same as that of any free man, with the distinction that if he should commit a felony thereafter, he will be compelled, in addition to punishment for that crime, to respond for the balance of his unexpired term under the prior offense. I, therefore, hold that the Board of Parole had no jurisdiction to apprehend him; and that there is not even reasonable ground presented for suspecting that he has been convicted of a felony so as to impel the court of its own motion to inquire as to whether he should be returned to prison. Accordingly, the writ in his case is sustained and the relator discharged.

The case of Madden presents certain unique features. No question of the original jurisdiction of the Parole Board is involved here. Released on parole on February 24, 1923, he reported monthly to the Catholic Protective Society, in accordance with the conditions of his release, until January, 1927, when the requirement for such reports was suspended by the authorities. For two years thereafter and until February, 1929, he reported quarterly by mail to the society. On March 6, 1929, the Commissioner of Correction addressed a communication to Mr. John P. Bramer, director

of the division of protective care of the Catholic Protective Society, as follows:

" *March* 6, 1929.

" Mr. JOHN P. BRAMER,
　" 477 Madison Avenue,
　　　" New York City.

" DEAR SIR: According to the rules of the Parole Board the following named parolees are eligible for consideration of conditional *discharge* this month:

" *Owen Madden*, No. 66164.
" Michael Jegle, No. 72733.
" Charles Russo, No. 78370.
" R. T. Stewart, No. 69868.

" Will you therefore kindly furnish letters of recommendation setting forth the facts as to whether or not, since the suspension of reports, they have been working steadily and otherwise conducting themselves in accordance with the conditions of their parole. If this data is received prior to the meeting, and is favorable, *we will present their names*.

" Thanking you, I remain,
　　　　" Yours very truly,
　　　　　　" F. C. KIEB,
　　　　　　　" *Commissioner*."

(Italics mine.)

In reply to this letter the following communication was addressed by Mr. Bramer:

" *March* 14, 1929.

" Honorable RAYMOND F. C. KIEB, M. D.,
　" Commissioner of Correction,
　　　" 11 North Pearl Street,
　　　　"Albany, N. Y.

" DEAR SIR: We have your letter of March 6th, concerning *Owen Madden* No. 66164. In reply would say, that to the best of my knowledge this man has been conducting himself in accordance with the conditions of his parole and *I* would, therefore, *recommend* the conditional *discharge*.

" Thanking you for your courtesy in this matter, I am,
　　　　" Very truly yours,
　　　　　　" JOHN PHILIP BRAMER,
　　　　　" *Director, Division of Protective Care*."

(Italics mine.)

In response, it appears, by documentary evidence, that the Commissioner sent letters to three of the parolees in the group

of four mentioned in his letter of March 6, 1929, namely, Jegle, Russo and Stewart. Each one of these letters was addressed to the respective person, care of Mr. Bramer, and read as follows: " Enclosed herewith you will please find the *certificate* of your *discharge* from Sing Sing Prison.

" Yours truly,

" R. F. C. KIEB,

" *Commissioner.*"

(Italics mine.)

There is no written proof that such a letter was sent to Madden. At the same time I consider that there is much in the record that fully justifies the deduction that such a letter was actually sent. The utterances of McMullen, Schildknecht, Northrop, Miss Brady, and even Burns, seem strongly to support this conclusion. In any event, if proof of this fact were conceded, would that tend to establish the non-existence of the jurisdiction of the Board of Parole? The question seems complicated by the fact that the expression " conditional discharge" is employed by the Commissioner of Correction in his request to the Catholic Protective Society to submit its recommendations. If it were termed " absolute discharge," there would be no question but that the jurisdiction of the Board of Parole had ended. While the statute (Prison Law, § 218, added by Laws of 1912, chap. 286) contains a provision with regard to absolute discharge, there is no reference to the other expression in the Prison Law. In the Correction Law, section 220 (added by Laws of 1928, chap. 485, as amd. by Laws of 1931, chap. 304), conditional and absolute discharge from parole are abolished. But no definition of the terms is contained there.

The letter of Commissioner Kieb addressed to each of the other three parolees in the Madden group *discharges* them from prison. The effect of that language quite obviously is to grant an absolute discharge within the meaning of the pre-existing section 218, save possibly for the condition imposed in rule 9 of the then rules of the Board of Parole. If Madden received such a letter, the Parole Board can have no jurisdiction over him and he must be discharged, subject to the liability under rule 9 to serve his unexpired term only in the event of a conviction for a subsequent felony, provided that conviction occurs during the limits of his maximum term. Respondent argues that the conditional discharge mentioned by Commissioner Kieb in his first letter had reference to the privilege of " suspended reports." This interpretation is very unlikely, because for two years prior to the date of the recommended discharge, such reports had been suspended. What would the new privilege of a conditional discharge add in such an event? The

wording of the last letter of Dr. Kieb shows beyond doubt that it was a discharge from State prison, and not a mere release — a discharge not only from confinement, which had taken place a great many years before, but from what might be termed " jail liberties." When and if such discharge occurred, relator Madden became a free man, subject only to the liability to serve his unexpired term in case he should thereafter be convicted for a felony. It may be that, technically, if the discharge is established, the Parole Board may not apprehend him on its warrant. But even if this be so, the court of its own motion may direct an inquiry into the cause of his apprehension so that it can be decided whether he has rendered himself subject to the liability to serve his unexpired term, by reason of a conviction of a second felony during his commuted term. " He was before the court on a writ of habeas corpus granted on his own application, and he thereby submitted to the court the whole question of his right to a discharge or his liability to a recommitment." (*People* v. *Burns, supra.*) As, however, no pretense of an allegation of this kind is made in the papers, it is unnecessary to make any investigation beyond the question of whether Madden has actually been discharged from prison in the manner in which the three other members of his group were discharged at the time the recommendations were made by the Catholic Protective Society. This is the sole subject of inquiry, to arrive at the solution of which I have considered the affidavits bearing upon this point.

On behalf of Madden a situation is presented which appears to shift the burden of explanation upon the Parole Board. Up to the date when the director of the Catholic Protective Society made the official recommendation for his conditional discharge, together with that of the three others, there is no dispute of the facts. Within a week thereafter, or about March 21, 1929, it appears from unquestionable records that the three others than Madden were sent certificates of their discharge. Why is there no such record of action regarding Madden? Commissioner Moore testifies that in the " minutes " of the Board, his name does not appear as discharged, but the names of the other three do appear. The so-called minutes in reality appear to be a mere abstract of names. Neither a stenographic record of proceedings, nor a transcript thereof, seems to be available. It is rather strange that if, notwithstanding the unqualified recommendation of the society, Madden was refused a discharge, no record was made of such adverse action. Schildknecht of the society and Miss Brady, his secretary, swear positively that its recommendation was invariably followed by the Board of Parole. Commissioner Jones disputes this,

although he cites no specific instances to the contrary. Even if his view be accepted, it must be granted that a refusal to discharge in such a situation — especially in the light of Dr. Kieb's letter and the reply — would be most extraordinary. It might indicate that something had occurred in the few intervening days to compel adverse action. There is no record of such an event and it is hardly likely that it occurred, because it would have been of a sufficiently serious nature to leave an impress upon some official record and perhaps lead to relator's seizure as a parole violator. Again, if the Board of Parole had decided to adopt the unusual step of vetoing the recommendation for his discharge by reason of his past record, or for any other reason whatever, would not some register of the discussion be somewhere in existence? Would not some word of caution have been sent to the society, followed perhaps by a revocation of the suspension of the reports privilege? Instead, the society marks its Madden records " closed " for the reason, as Miss Brady insists, from independent recollection, that Madden had been discharged; and the official guardians of our penal system forgot his existence until about January, 1932, when certain newspaper publicity caused Madden to voluntarily present himself at the office of Major McMullen, the acting deputy chief parole officer. The latter then requests him to follow the path of " least resistance " by reporting but once a year. Madden persists that he was discharged, but yields to the importunity only as " the better part of wisdom." His next report under the arrangement is not due until January, 1933, but on February 11, 1932, he is suddenly apprehended as a parole violator. What crime did he commit? Of what anti-social conduct was he guilty? He is charged with the heinous offense of misrepresenting some details of his connection with the Hydrox Laundry.

Between January and February the parole authorities suddenly came to the realization that he was a dangerous man at large, and this notwithstanding what is said to be the persuasive and continuous public report of Madden's " racketeering " and " bootlegging " activities for a long time previous to that date. If Madden committed all the misdeeds of which he is accused, he should have been apprehended long ago. His arrest on flimsy and highly technical grounds with the purpose of returning him summarily to the State prison is an attempt to convict him under color of law for wrongs which cannot be brought home to him by competent evidence. Such acts of indirection cannot receive the sanction of the court, unless it indisputably appears that Madden is still under the paternally corrective jurisdiction of the Board. But all the circumstances mentioned indicate his actual discharge.

There are circumstances, too, quite numerous indeed, that have not been mentioned, which point clearly to this result. For example, the newspaper interview with Mr. Fagen — of itself beyond the pale of legal evidence — is nevertheless furnished here under sanctity of oath, and yet it remains unchallenged and undenied; again disclosing that the very Board recognized that it had no power over Madden except for a violation of rule 9 as a condition of his parole. The absence of an affirmative record is not persuasive, in view of the fact that full records during that period may scarcely be said to have been kept. And it is only within the past two years that comprehensive and completely centralized records have been maintained by the Board. The fact that upon Madden's index card with the Board no record of any kind appears subsequent to December, 1926, and more particularly no entry whatever even as to the suspension of reports privilege occurring in January, 1927 — is of itself most eloquent evidence of the incompleteness of the old system of records.

The conclusion is, therefore, inevitable that Madden must have been discharged. Accordingly, I rule that the Board of Parole has been divested of jurisdiction in the case and that the writ must be sustained and the relator Madden discharged.

Writs sustained and relators discharged.